1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRUE LEE JEFFERSON, JR., <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, <br> Acting Commissioner of Social Security, <br><br> Defendant. | Case No.: 1:17-cv-1694-JLT <br><br> ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST ANDRUE LEE JEFFERSON, JR. |

Andrue Lee Jefferson, Jr., asserts he is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks review of the decision denying his applications for benefits. Because the ALJ applied the proper legal standards and her findings are supported by substantial evidence, the administrative decision is **AFFIRMED**.

## **PROCEDURAL HISTORY**

In his applications for benefits, Plaintiff alleged disability beginning on April 7, 2010. (Doc. 13-6 at 3, 7) The Social Security Administration denied the applications at the initial level and upon reconsideration. (*See generally* Doc. 13-4; Doc. 9-3 at 17) After requesting a hearing, Plaintiff testified before an ALJ on August 16, 2016. (*See* Doc. 13-3 at 17, 31) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on November 1, 2016. (*Id.* at 17-24) When the

Appeals Council denied Plaintiff's request for review on September 11, 2017 (*id.* at 8-11), the ALJ's findings became the final decision of the Commissioner of Social Security.

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.  Relevant Medical Background**

In November 2012, Plaintiff visited Community Medical Centers ("CMC") due to pain in his left knee. (Doc. 13-8 at 6) He told Dr. Jeffrey Riddell that he had "'fluid on the knee' for years," and it had been drained twice. (*Id.*) Dr. Riddell ordered imaging, which showed Plaintiff had "multiple foci of heterotrophic ossification" and calcification. (*Id.*) The x-rays showed also degenerative changes in the left knee "consistent with joint space narrowing" and "a large joint effusion." (*Id.* at 23) Dr. Riddell found Plaintiff had a "[f]ull passive" range of motion in his left knee, with "[s]ome clicking on flexion." (*Id.* at 7) Dr. Riddell also determined Plaintiff and +1 edema in the lower left extremity, and performed an arthrocentesis on the knee, with 175ml drained. (*Id.* at 7-8) Plaintiff received a referral to an orthopedist "given [the] advanced nature of arthritis." (*Id.* at 7)

On December 1, 2012, Plaintiff returned to CMC where he was evaluated by Dr. John Vajner. (Doc. 13-8 at 8) Plaintiff reported that he had an appointment set for the following month with an orthopedist "for consideration of knee replacement." (*Id.*) Dr. Vajner found Plaintiff exhibited edema and tenderness in his left knee but no erythema or warmth. (*Id.* at 9) Upon the request of Plaintiff, his knee was again drained. (*Id.* at 9-10)

In March 2013, Plaintiff visited the CMC emergency department with reports of left knee pain. (Doc. 13-8 at 11) Rose Chang, NP, observed that Plaintiff had "swelling and effusion" in his left knee and walked with a "[m]ild limp." (*Id.* at 12) She determined Plaintiff's range of motion in his knee was normal and found "no bony tenderness." (*Id.*) Plaintiff's knee was drained, with approximately

35ml of fluid removed. (*Id.* at 13) Additional x-rays of Plaintiff's knee were taken, and Dr. Gabrriela Tarau determined Plaintiff had "moderate degenerative disease of the knee joint," "prominent spurring," "ossified soft tissues," and "a probable joint effusion." (*Id.* at 23-24) She compared the x-rays from those in November and found "no significant change." (*Id.* at 24)

The following month, Plaintiff returned to CMC where he continued to complain of "knee pain and swelling." (Doc. 13-8 at 14) Dr. Kristofer Richter noted Plaintiff's current medications included ibuprofen, tramadol, and creams for athlete's foot. (*Id.* at 14, 18) Dr. Richter determined Plaintiff's left knee was "tender to palpation" and exhibited "extensive soft tissue swelling above the knee with some crepitus-type feeling." (*Id.* at 15) He also observed that Plaintiff walked with a normal gait and he had "[n]ormal sensation and proprioception." (*Id.*) Dr. Richter indicated it was "uncertain" why Plaintiff's knee condition was worsening and indicated he would order an MRI and "refer [Plaintiff] to ortho for a consult." (*Id.*) He directed Plaintiff to return to CMC in three months. (*Id.*)

In June 2013, Plaintiff underwent an MRI without contrast. (Doc. 13-8 at 24) According to Dr. Kurt Hildebrandt, Plaintiff had "[s]evere degenerative changes… secondary to chronic internal derangement," "[c]omplete chondral denuding of the weight-bearing surfaces of the medial femoral condyle and medial tibial plateau with resulting large ossified articular bodies," and "a [c]omplex tear of the… medial meniscus." (*Id.* at 25) Dr. Hildebrandt noted he also "[s]uspect[ed] a chronic full-thickness tear of the distal insertional fibers of the anterior cruciate ligament with re-annilment of the torn margin." (*Id.*)

In August 2013, Plaintiff returned to CMC and said he continued to have "sever[e] 10/10 pain that [was] unrelieved with … ultram and ibuprofen." (Doc. 13-8 at 16) He told Dr. Lynn Keenan that his pain was "worse with walking, and relieved in certain positions and rest." (*Id.*) Dr. Keenan noted Plaintiff denied feeling any "joint pain, swelling, [and] stiffness." (*Id.* at 17) She observed that he walked with a normal gait and found "mild swelling" without laxity in Plaintiff's knee. (*Id.*)

In May 2014, Plaintiff sought to establish care with Clinica Sierra Vista, reporting CMC's urgent care no longer accepted his insurance. (Doc. 13-8 at 31) He reported that his pain was "10/10" and he was awaiting surgery on his left knee. (*Id.*) Nyein Win, a board-certified nurse practitioner, observed that Plaintiff had an antalgic gait and walked with a cane on his left side. (*Id.* at 33) She

noted Plaintiff exhibited tenderness and "moderate pain [with] motion." (*Id.*) Ms. Win prescribed ibuprofen and naproxen to Plaintiff. (*Id.* at 34)

Plaintiff continued to report "severe [left] knee pain" in June 2014. (Doc. 13-8 at 40) Plaintiff admitted he was "using marijuana every other day, and stated naproxen was "not helping his pain at all." (*Id.*) He requested a prescription for Vicodin, which Ms. Win provided. (*Id.* at 40, 43) She noted Plaintiff exhibited tenderness in both knees and pain with range of motion. (*Id.* at 42) Ms. Win discussed with Plaintiff the "detrimental effects on health" caused by obesity and advised him "regarding diet and exercise modifications to help start losing weight." (*Id.*)

Dr. Jordan Beshore performed an orthopedic surgical examination of Plaintiff on July 16, 2014. (Doc. 13-8 at 56) Plaintiff reported his pain was "gradually worsening," and he felt "constant pain even at rest," which he rated "as severe [and] 10/10 with ambulation." (*Id.*) Dr. Beshore found Plaintiff had mild swelling in the knee and "[p]alpable dense round masses." (*Id.* at 57) He noted Plaintiff did "not want to try physical therapy or joint injections" and "all conservative treatments" had been exhausted. (*Id.* at 58) Dr. Beshore opined Plaintiff would "require total joint replacement of [the] left knee," with which Plaintiff agreed. (*Id.*)

Dr. A. Pan reviewed available records and completed a residual functional capacity assessment on July 29, 2014. (Doc. 13-4 at 5-8) Dr. Pan found insufficient evidence for an impairment prior to Plaintiff's date last insured for the Title II benefits. (*Id.* at 5) Dr. Pan opined Plaintiff was currently able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk "[a]bout 6 hours in an 8-hour workday," and sit "[a]bout 6 hours in an 8-hour workday." (*Id.* at 7) According to Dr. Pan, Plaintiff could frequently climb ladders, ropes, scaffolds, ramps, and stairs; balance; stoop; kneel; crouch; and crawl. (*Id.*)

In August 2014, Plaintiff stated the Vicodin was not helping and continued to report pain at a level of "10/10." (Doc. 13-8 at 36) Dr. Francisco Dorado observed that Plaintiff walked with a normal gait. (*Id.* at 38) However, Plaintiff had a "severely reduced" range of motion in his left knee. (*Id.*)

On September 3, 2014, Plaintiff had his pre-operative evaluation. (Doc. 13-8 at 58) Plaintiff reported that he was "unable to walk more than 1 block without stopping or climb 1 flight of stairs." (*Id.* at 60) Plaintiff was informed regarding the risks and benefits of the knee replacement and elected

to proceed. (*Id.* at 62) Plaintiff had the total knee replacement on September 18, 2014. (*Id.* at 71-72)

Following the procedure, Plaintiff worked with a physical therapist for range of motion and strength prior to ambulation. (Doc. 13-8 at 70) On September 22, Matt Byers, PT, noted Plaintiff was able to transfer in and out of bed independently and his "gait [was] improving," though he remained "limited by pain." (*Id.*) The same day, Plaintiff was "discharged to a skilled nursing facility with rehab." (*Id.* at 68) Upon discharge, Plaintiff was directed to "ambulate as much as [he] can tolerate." (*Id.* at 68-69)

On October 15, 2014, Plaintiff had a surgical follow-up with Dr. Kimberly Grannis. (Doc. 13-9 at 60) Plaintiff reported his pain was "well controlled with Norco," and "inquir[ed] about disability." (*Id.*) Dr. Grannis noted Plaintiff was "ambulating without assistance." (*Id.* at 60) She believed Plaintiff was "doing well" and would be able to "return to work with full recover 4 months from [his] surgery date." (*Id.*)

Plaintiff visited the Community Outpatient Rehabilitation Center at CMC to develop a physical therapy treatment plan on October 22, 2014. (Doc. 13-9 at 54) Plaintiff reported he had "difficulty standing over 20 minutes even with the use of a [front-wheel walker]" and stated he could "only walk about a block before sitting down." (*Id.*) Glenn Limas, PT, found Plaintiff's music strength was "3-/5" in his left knee with flexion and extension. (*Id.*) He also determined Plaintiff had a restricted range of motion. (*Id.* at 55) Mr. Limas recommended Plaintiff receive 6-7 sessions of physical therapy. (*Id.*)

Dr. Linda Kiger reviewed the record and completed physical residual functional capacity assessments on November 3, 2014. (Doc. 13-14 at 28-31) Dr. Kiger opined that from May 20, 2014 through September 7, 2014, Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently, sit about six hours in an eight-hour day, and stand and/or walk about six hours in an eight-hour day. (*Id.* at 30) She opined that during the same period, Plaintiff was unable to push or pull with the left leg, could occasionally climb, crouch, and crawl; and frequently balance and stoop. (*Id.* at 30) Dr. Kiger adjusted the limitations based on the record after Plaintiff's surgery, and found beginning September 18, 2014, Plaintiff was able to perform medium work with postural limitations. (*Id.* at 29) Dr. Kiger opined Plaintiff could lift and carry 50 pounds occasionally 25 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at

6

29) She opined Plaintiff had an unlimited ability to push and pull, and could frequently climb ladders, ropes, scaffolds, ramps, and stairs; balance; stoop; crouch; and crawl. (*Id.* at 29)

At a physical therapy session on November 12, 2014, Plaintiff described his pain as "9/10," and reported he had not "consistently" able to work on his home exercise program "due to other priorities." (Doc. 13-9 at 50) Mr. Limas observed that Plaintiff had "increased muscle tension to the hamstrings," but "[w]ith manual therapy," his knee extension improved. (*Id.*) On November 18, Mr. Limas noted Plaintiff "completed 1/5 physical therapy appointments." (*Id.* at 45) According to Mr. Limas, Plaintiff had increased his range of motion, gained strength, and "the previous gait deficits [were] no longer manifested." (*Id.*) However, Plaintiff complained of "10/10 pain." (*Id.*) Mr. Limas indicated Plaintiff's treatment goals were "partially met," but Plaintiff failed to schedule his remaining sessions. (*Id.* at 46) Plaintiff was discharged from physical therapy with CMC's orthopedic services. (*Id.*)

On January 22, 2015, Plaintiff visited Clinica Sierra Vista, requested a "referral to get a [c]ane." (Doc. 13-10 at 24) Txong Her, PA, noted Plaintiff reported he was not taking Ibuprofen, Naproxen, or Vicodin. (*Id.* at 25) Plaintiff stated his pain was "10/10." (*Id.* at 26)

The next week, Dr. Grannis performed a second post-surgery examination. (Doc. 13-9 at 37) She noted Plaintiff was "weight bearing as tolerated with no sports activity." (*Id.*) Plaintiff reported he was "doing well overall" and his "[p]ain [was] well controlled." (*Id.*) Dr. Grannis noted Plaintiff "request[ed] one year of disability." (*Id.*) Upon examination, she found Plaintiff's knee was "well healed," and indicated he could be "weight bearing as tolerated." (*Id.*) Dr. Grannis opined Plaintiff had "no restrictions," though he should "[l]imit sports activities to prevent early revision." (*Id.*)

Dr. Danielle Malvini conducted a third post-surgical evaluation in March 2015. (Doc. 13-9 at 31) Plaintiff told Dr. Malvini he was "doing well overall," and indicated his pain was "well controlled with percocet." (*Id.*) In addition, Plaintiff stated he was walking about 4-5 blocks and was "able to stand for approx[imately] 1 hour before he has pain." (*Id.*) He reported his right knee "hurt[] sometimes" and indicated he would like a new prescription for pain medication. (*Id.*) Dr. Malvini determined Plaintiff had a "full" range of motion on extension in both legs, though his flexion was limited to 110 degrees in the left knee. (*Id.*) She determined both knees were stable to stress, and his strength level was 5/5 in both legs. (*Id.*) Dr. Malvini refilled Plaintiff's prescription for Percocet but

indicated Plaintiff would need to see a primary care physician "in the future for pain management." (*Id.* at 32)

In May 2015, Plaintiff returned to Clinica Sierra Vista where he was again seen by Ms. Her. (Doc. 13-10 at 23) She observed that Plaintiff exhibited an antalgic gait and tenderness in the left knee, though his right knee was normal. (*Id.*) She recommended Plaintiff lose weight and "[m]aintain a regular cardiovascular exercise program 3-5x/week." (*Id.* at 21) Ms. Her indicated she would "[o]rder [a] cane to help with ambulation." (*Id.* at 22)

In September 2015, Ms. Her observed that Plaintiff was not using an assistive device to walk, and he continued to have an antalgic gait. (Doc. 13-10 at 17) According to Ms. Her, Plaintiff exhibited moderate pain with motion in his left knee, and the examination of the right knee was normal. (*Id.*) She prescribed Plaintiff naproxen for inflammation and tramadol for pain. (*Id.*)

In November 2015, Dr. Than Aw evaluated Plaintiff at Clinica Sierra Vista. (Doc. 13-10 at 8-13) Plaintiff told Dr. Aw that his pain continued to be "10/10." (*Id.* at 11) Dr. Aw opined Plaintiff's pain was "predominately muscular in nature and or referred from/to referenced muscles/joint structures." (*Id.* at 12)

On December 4, 2015, Plaintiff sought to establish care with LAGS Spine and Sportscare. (Doc. 13-9 at 68) He reported that his left knee pain was "10/10" both with and without medication, and described the pain as aching, burning, cramping, dull, sharp, stabbing, and squeezing. (*Id.* at 68-69) Latavia Esters, PA, observed that Plaintiff's gait was abnormal, though he was able to walk on heels and toes. (*Id.* at 69) Plaintiff exhibited pain with range of motion testing of his left knee, though he did not have palpable tenderness. (*Id.*) Plaintiff tested positive for marijuana and indicated he would obtain a THC card the following month. (*Id.* at 70)

In January 2016, Plaintiff continued to report pain at the level of "10/10." (Doc. 13-9 at 61) Ms. Esters observed that Plaintiff walked with an abnormal gait and exhibited pain upon range of motion in the left knee but not in the right. (*Id.* at 62) She noted Plaintiff did not produce a TCH card and indicated he needed to bring one. (*Id.* at 63) Ms. Esters refilled the prescriptions, including Norco, Naproxen, and Lidocaine ointment. (*Id.*)

In May 2016, Plaintiff returned to Clinica Sierra Vista, requesting a "physical therapy referral

and… general relief paperwork." (Doc. 13-10 at 2) Plaintiff's musculoskeletal examination was negative for "[b]ack pain, joint pain, joint swelling, muscle weakness and neck pain." (*Id.* at 4) In addition, he did not have any edema in his extremities. (*Id.* at 5) Dr. Aw noted Plaintiff had lost 7 pounds and recommended a "[r]eduction of fat, fried food, [and] animal meat intake." (*Id.* at 7)

Plaintiff had his initial evaluation to begin physical therapy again with Marla Fermoile, PT, on July 11, 2016. (Doc. 13-10 at 33) Ms. Fermoile opined Plaintiff exhibited "significant [left] knee dysfunction," including "significant edema most likely resulting from hypermobility of [the] tiblofemoral joint." (*Id.* at 34) She noted she informed Plaintiff he needed to ice, elevate his leg, and take the medication "as prescribed for [a] minimum of 2 weeks." (*Id.*) Ms. Fermoile indicated she would see Plaintiff once a week, for four to six weeks. (*Id.* at 36)

**B.     Plaintiff's Hearing Testimony**

Plaintiff testified before the ALJ on November 2, 2016. (Doc. 13-3 at 31) He reported he suffered from knee pain and had a total knee replacement on September 18, 2014. (*Id.* at 35) Plaintiff indicated he was prescribed a four-point cane about eight months prior to the hearing. (*Id.*) He stated that prior to using the cane, he used a walker that he received at a rehabilitation facility following his surgery. (*Id.* at 36)

He reported that the surgery "helped relieve some of the pain," but he was "still having more pain than what [he] was having before the surgery." (Doc. 13-3 at 40) He stated he felt pain "all the time." (*Id.*) On a "scale of one to ten, ten being so bad you end up in the hospital and one is nearly the absence of pain," Plaintiff said his pain level was a "[t]en or plus" without medication. (*Id.* at 41) Plaintiff testified his pain medication "work[ed] for 20 minutes but the pain [would come] right back ten times more stronger than what it was before." (*Id.*)

In addition, Plaintiff reported he had swelling in his knee sometimes, though his Naproxen was "supposed to take the swelling down." (Doc. 13-3 at 41-42) He estimated that he had swelling in his left knee four days each week, which would "last[] all night until the next day." (*Id.* at 42) Plaintiff stated he would elevate his leg to "waist high" to alleviate the swelling. (*Id.*)

Plaintiff estimated that he "could stand for about 20, 30 minutes" before he would "have to sit down and elevate [his] leg." (Doc. 13-3 at 43) He stated that prior to his surgery he was able to stand

9

longer than 30 minutes at a time, but after his knee replacement he "couldn't do it." (*Id.* at 43-44) Plaintiff believed he would need "about an hour" break before he could get back up again. (*Id.* at 45) He reported that after getting the cane, he could walk a block but would "sit down for at [least] about 20, 30 minutes before [he could] continue on." (*Id.*) Plaintiff estimated that in an eight-hour day, he would stand "about four hours" and walk "[a]bout three hours." (*Id.* at 46) In addition, he estimated that he spent "about two-and-a-half hours" sitting each day. (*Id.*)

He stated that he tried not to lift anything because he was told that if he lifted "anything heavy," his legs would "give out" but still believed he could lift "about 50 to 70 pounds." (Doc. 13-3 at 47) Plaintiff testified the last time he lifted that much weight was prior to his surgery, and he could not "recall picking up anything heavy" after the surgery. (*Id.*)

The ALJ observed treatment notes suggested Plaintiff was "fully ambulating" and was "weight-bearing by October 10th, 2014," which is when Plaintiff was discharged from the rehab hospital. (Doc. 13-3 at 36) Plaintiff responded that when he left the rehabilitation facility, he "was walking with a walker" and "was never weight-bearing" after the surgery. (*Id.* at 38-39) He testified he "always had to use things to walk with when [he] got out of Golden Living." (*Id.* at 39)

The ALJ observed that treatment notes "about a year after the surgery" indicated Plaintiff talked to his doctor and said he was "walking about four to five blocks and [he] could stand about an hour before [he] was in any pain." (Doc. 13-3 at 44) Plaintiff responded, "I don't recall that." (*Id.*)

### C. Vocational Expert Testimony

Linda Ferra, a rehabilitation counselor, testified as a vocational expert ("the VE") at the hearing. (Doc. 13-3 at 51) The ALJ asked the VE "to consider someone the same age, education, and past work as Mr. Jefferson." (*Id.* at 52) The ALJ indicated:

> [T]his hypothetical person would have the following limitations, specifically lifting and carrying no more than 20 pounds occasionally, 10 pounds frequently; pushing and pulling within those weight limits, but no foot controls with the lower left extremity.
> Standing and walking would be limited to four hours out of eight hours; sitting is six out of eight with the ability to stand and stretch for at least one minute every hour; no ladders, ropes or scaffolds; no crawling[;] no kneeling.

(*Id.* at 52-53) The VE opined the person with these limitations could perform "sedentary, unskilled" jobs such as assembler, *DOT* 734.687-018; charge account clerk, *DOT* 205.367-014; and order clerk,

*DOT* 209.576-014. (*Id.* at 53) She explained that she identified sedentary work "because of the four out of eight [hours] standing and walking." (*Id.* at 54) The ALJ asked the VE to consider the same individual limited to standing and walking "to two out of eight" hours, and the VE opined the same sedentary jobs would remain. (*Id.*)

The ALJ also asked the VE to consider a hypothetical individual with the following limitations:

> [I]f it was lifting and carrying no more than ten pounds either frequently or occasionally; pushing and pulling within those weight limits but no foot controls with the lower left extremity; standing and walking two out of eight hours; but no prolonged walking greater than about 15 minutes at a time, and that would be with the use of a cane.
> Sitting six out of eight with the ability to stand and stretch about a minute every hour; no ladders, ropes and scaffolds; no crawling[;] no kneeling.

(Doc. 13-3 at 55-56) The VE opined these limitations were consistent with the sedentary jobs she previously identified. (*Id.* at 56)

**D.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of April 7, 2010. (Doc. 13-3 at 19) At step two, the ALJ found Plaintiff's severe impairments included: "obesity and degenerative joint disease and osteoarthritis in the left knee with total left knee replacement." (*Id.* at 20) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.*) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform a range of work at the sedentary exertional level as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, he can lift and carry 10 pounds occasionally and frequently and can push and pull within these same limitations, but he is unable to operate foot controls with the lower left extremity. The claimant can stand and walk two hours in an eight-hour workday with the use of a cane, but he is unable to engage in prolonged walking of over 15 minutes at time. He can sit six hours in an eight-hour workday, but must have the ability to stand and stretch for one minute every hour. In addition, the claimant is unable to crawl, kneel, or climb ladders, ropes, or scaffolds.

(*Id.* at 20) At step four, the ALJ noted Plaintiff had no past relevant work. (*Id.* at 23) At step five, the ALJ found there were "jobs that exist in significant numbers in the national economy that [Plaintiff] can perform," such assembler, charge account clerk, and order clerk. (*Id.* at 23-24) Therefore, the ALJ concluded Plaintiff was not disabled "as defined by the Social Security Act, from April 7, 2010,

through the date of [the] decision." (*Id.* at 24)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny his application for benefits, Plaintiff asserts the ALJ did not identify clear and convincing reasons to reject his testimony. (Doc. 19 at 8) In addition, Plaintiff asserts the ALJ failed to articulate "a complete and accurate hypothetical question to the vocational expert." (*Id.* at 5, emphasis omitted)

### A. Limitations to which Plaintiff testified and the RFC

As an initial matter, the Court notes that Plaintiff fails to identify the subjective complaints and limitations addressed in his testimony that he believes the ALJ should have been incorporated into the residual functional capacity and the Court is unable to speculate. *See Valentine v. Astrue,* 574 F.3d 685, 692 n.2 (9th Cir. 2009); *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting the Court "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant'"). Previously, the Ninth Circuit "reject[ed] any invitation to find that the ALJ failed to account for [the claimant's] injuries in some unspecified way" where the claimant failed to "detail what other physical limitations" he believed should have been included in the RFC. *See Valentine,* 574 F.3d at 692 n.2.

Courts throughout the Ninth Circuit have determined that the failure to identify the specific limitations that should have been incorporated into a residual functional capacity is fatal to a challenge of the ALJ's findings. *See, e.g.*, *Juarez v. Colvin*, 2014 U.S. Dist. LEXIS 37745 at *15 (CD Cal. Mar. 20, 2014) (rejecting an argument that the ALJ erred in evaluating the claimant's limitations where she had "not specified or proffered evidence of any additional limitations from the arthritis that the ALJ failed to consider"); *Hansen v. Berryhill,* 2018 U.S. Dist. LEXIS 19489 (W.D. Wash. Feb. 6, 2018) ("Although Plaintiff argues that the ALJ erred in failing to account for the limitations caused by his ADHD in the RFC assessment, he does not identify which limitations were erroneously omitted, and has thus failed to state an allegation of error"); *Thomas v. Comm'r of SSA*, 2015 U.S. Dist. LEXIS 99338 at *21 (Dist. Or. Jul 30, 2015) ("Plaintiff does not cite to evidence of physical limitations stemming from these impairments beyond those already listed in his RFC. Without more specific information on how these conditions hinder Plaintiff, the Court declines to find the ALJ failed to

account for Plaintiff's limitations").

Moreover, despite finding Plaintiff's testimony was "not entirely consistent with the medical evidence and other evidence in the record" (Doc. 13-3 at 23), the ALJ clearly gave Plaintiff the benefit of the doubt by identifying an RFC that was, in many respects, more restrictive than the limits to which Plaintiff testified. For example, though Plaintiff testified that in an eight-hour day he currently spent "about four hours" standing and "[a]bout three hours" walking with a cane, the ALJ indicated in the RFC that Plaintiff was able to "stand and walk two hours in an eight-hour workday with the use of a cane." (*Compare* Doc. 13-3 at 20 *with* Doc. 13-3 at 46) Similarly, the RFC limitation for lifting and carrying was more restrictive than Plaintiff's own stated abilities. Plaintiff testified he could lift "about 50 to 70 pounds," though he tried to not lift anything heavy because his legs would "give out." (*Id.* at 47) In the RFC, the ALJ determined Plaintiff "can lift and carry 10 pounds occasionally and frequently and can push and pull within these same limitations…" (*Id.* at 21)

Because Plaintiff fails to identify any specific limitations to which he testified that were unaccounted for in the RFC, Plaintiff fails to show any error in the ALJ's analysis of his subjective complaints. *See Valentine,* 574 F.3d at 692 n.2; *see also Ivory v. Colvin,* 2013 WL 6182573 at *8 (E.D. Cal. Nov. 25, 2013) (finding the ALJ did not err in evaluating the record where the ALJ found the claimant lacked credibility, but "assessed a more restrictive RFC"); *Cortez v. Colvin,* 2014 WL 1725796, at *6 (C.D. Cal. Apr. 30, 2014) (finding the ALJ did not err where the claimant was "less than fully credible" but the ALJ nevertheless gave the claimant "the benefit of the doubt [and] found a more restrictive RFC").

**B.    Vocational Expert Testimony**

An ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or her functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). When eliciting testimony from a vocational expert, the ALJ must set forth "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." *Tackett*, 180 F.3d at 1101 (quoting *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)).

Only limitations supported by substantial evidence must be included. *Robbins v. Soc. Sec.*

*Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). When the "weight of the medical evidence supports the hypothetical questions posed," the ALJ's findings will be upheld by the court. *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

Plaintiff contends the ALJ erred with the hypothetical questions posed to the vocational expert because "the ALJ's RFC requires the use of a cane when standing and walking," though the "hypothetical question sets forth the use of a cane when walking, but not standing." (Doc. 19 at 7) Defendant counters that Plaintiff is "attempt[ting] to manufacture an ambiguity in the ALJ's hypothetical," and the question posed to the vocational expert was "sufficiently clear" with the ALJ specifying the use of a cane was for standing and walking. (*Id.*)

The Court agrees with Defendant that the hypothetical posed to the vocational expert incorporates the RFC limitations. The ALJ asked the vocational expert to consider someone who could engage in "standing and walking two out of eight hours; but no prolonged walking greater than about 15 minutes at a time, and that would be with the use of a cane." (Doc. 13-3 at 55-56) Likewise, in the RFC, the ALJ indicated Plaintiff could "stand and walk two hours in an eight-hour workday with the use of a cane, but he is unable to engage in prolonged walking of over 15 minutes at a time." (*Id.* at 20) Both the hypothetical and the RFC indicate Plaintiff required the use of a cane for standing *and* walking. Plaintiff's argument regarding the hypothetical and the RFC is a distinction without a difference.

Because the ALJ's hypothetical question to the vocational expert included the limitations incorporated in the RFC, Plaintiff fails to show the ALJ erred in relying upon the vocational expert's testimony to conclude Plaintiff can perform work existing in significant numbers in the national economy at step five.

///

## **CONCLUSION AND ORDER**

As discussed above, Plaintiff fails to demonstrate the ALJ erred in reviewing the record related

to his subjective complaints and obtaining testimony from the vocational expert. Thus, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS:**

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Nancy Berryhill, Acting Commissioner of Social Security, and against Plaintiff Andrue Lee Jackson, Jr.

IT IS SO ORDERED.

Dated: **March 22, 2019**   **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE